# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MATTHEW D. CARLSON,**

　　　　　　　　**Plaintiff,**

　　**v.**　　　　　　　　　　　　　　**Case No. 08-C-751**

**CITY OF DELAFIELD,**
**MICHELE DE YOE,**
**JEFF KRICKHAHN,**
**BETH ANN LEONARD,**
**GERALD MAC DOUGALL,**
**and IRV SADOWSKI,**

　　　　　　　　**Defendants.**

---

# DECISION AND ORDER

---

This civil rights action brought pursuant to 42 U.S.C. § 1983, with two supplemental state law claims, arises out of the termination of the employment of the Plaintiff, Matthew D. Carlson ("Carlson"), as the City Administrator for the City of Delafield ("City"). The Defendants are the City and five City alderpersons, Michele De Yoe ("De Yoe"), Jeff Krickhahn ("Krickhahn"), Beth Ann Leonard ("Leonard"), Gerald Mac Dougall ("Mac Dougall"), and Irv Sadowski ("Sadowski"). The alderpersons (the "individual Defendants"), are sued in their individual capacities.

Carlson's Amended Complaint ("Complaint") contains four claims. The Complaint asserts a Fourteenth Amendment claim under 42 U.S.C. § 1983 for deprivation of a property interest (first claim for relief), alleging that Carlson had a property interest in continued employment as City Administrator and that the City and the individual Defendants deprived him of that interest without due process of law. The Complaint alleges that, the individual Defendants met in secret, prior to the vote to terminate Carlson's employment, and decided to terminate his employment. It also alleges that the City did not have the right under Carlson's Contract, City ordinance, or statute to terminate his employment without cause by simply paying him a lump sum severance payment. Rather, Carlson alleges that, under his Contract, the City was required to conduct a due process hearing to determine if cause for termination existed and, that if the due process hearing were to result in a determination that the City did not have cause to terminate his employment, he would be entitled to the lump sum payment provided in the Contract in lieu of reinstatement and in addition to his other damages.

The Complaint also alleges a Fourteenth Amendment claim under 42 U.S.C. § 1983 for deprivation of Carlson's liberty interest in his reputation (second claim for relief) by the City and individual Defendants by terminating his employment in a manner that damaged his professional reputation and employability as a city manager by hurting his good name, reputation, honor and integrity in the community and forcing him to resign from the Lions Club, the YMCA Board and the hospital board, without due process of law.

The Complaint also asserts a claim under § 134.01 of the Wisconsin Statutes (third claim for relief), alleging that the individual Defendants conspired and acted in concert to maliciously and willfully injure Carlson in his reputation and profession.[1] Carlson alleges that the conspiracy and actions to injure him were taken collectively by the individual Defendants "to retaliate against Carlson for his response to the recommendations of the City's 'Plan B' Committee."[2] (Am. Compl. ("Compl.") ¶ 41; Ans. and Affirmative Defenses to Am. Compl. ("Ans.") ¶ 41.) For the individual Defendants, the Complaint also alleges, upon information and belief, the reasons why they acted to maliciously and willfully injure him: DeYoe is alleged to have acted because she believed Carlson was facilitating a commercial development she opposed; Krickhahn is alleged to have acted because Krickhahn lives across from the Village Square development, which he opposed and blamed Carlson for the development; and Leonard is alleged have acted because she was upset with land use decisions made under Carlson's leadership. Mac Dougall is alleged to have acted because Carlson refused to sign a statement of agreement with Plan B Committee's findings, and Sadowski is alleged to have acted because he was upset at Carlson's refusal to cite the Fishbone's

---

[1] Under 28 U.S.C. § 1367(a), federal courts "have supplemental jurisdiction over all other claims that are so related to claims [within the original jurisdiction] that they form part of the same case or controversy." *See Anderson v. Aon Corp.*, 614 F.3d 361, 364-65 (7th Cir. 2010). Carlson's claims under Wisconsin law arise from the same transactions that underlie his federal claims, so this Court has supplemental jurisdiction over his state law claims.

[2] The parties' proposed findings of fact do not disclose the nature of the Plan B Committee. According to the deposition of Ronald Miskelley ("Miskelley"), who was a City alderperson, the Plan B Committee was organized to develop an alternate plan and budget to rebuild the City's municipal buildings. (Trebatoski Aff. ¶ 4, Ex. C (Miskelley Dep.) 40.)

restaurant for a parking violation and because of Carlson's role in the investigation of an allegation of a bribe relating to a development.

Carlson's Complaint also alleges a claim for breach of contract (fourth claim for relief) alleging that the City breached the Contract by terminating him without cause, and by failing to pay him an additional $12,019.20 for accumulated leave time that he earned in 2007. Carlson seeks monetary damages and attorney's fees from the City, and monetary damages, attorney's fees, and punitive damages from the individual Defendants. Carlson does not seek injunctive relief or reinstatement with the City.

The matter is before the Court on the Defendants' motion for summary judgment dismissing the action.

### *STANDARDS APPLICABLE TO SUMMARY JUDGMENT*

In considering a motion for summary judgment, the Court applies the following standards. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th

Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

Rule 56(e)(2) addresses the opposing party's obligation to respond stating "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." In determining the material and undisputed facts, the Court has disregarded proposed findings of fact and responses that constituted legal conclusions, were argumentative or irrelevant, or were not supported by any citation to evidentiary material.

### *Preliminary Evidentiary Issues*

The Defendants have raised several evidentiary issues that pertain to Carlson's submissions in response to the summary judgment motion. The Court will address those preliminary issues.

### *Sham Affidavit*

In reply to Carlson's response to the Defendants' findings of fact and in response to Carlson's statement of additional facts, the Defendants assert Carlson's affidavit in opposition to their motion for summary judgment is a sham and lacks foundation. In challenging Carlson's affidavit as a sham, the Defendants rely on Carlson's response to paragraphs 23 and 25 of their proposed findings of fact, which does not dispute that he has no personal knowledge as to the reasons why any of the individual defendants voted to terminate his employment. (Defs.' Reply Br. 13-14 (citing Defs.' Proposed Finding of Fact ("PFOF") ¶ 25, admitted by Carlson).); *See also*, Defs.' Reply to Pl.'s Resp. Defs.' PFOF, Defs.' PFOF ¶ 23, Pl.'s Statement of Facts ¶ 8.) Those proposed findings of fact are based upon Carlson's responses at his deposition to questions about whether Carlson had any personal or first-hand knowledge regarding whether specific concerns alleged in the Complaint motivated a specific individual Defendant to support the termination of Carlson's employment. (*See* Braithwaite Decl. ¶ 3, Ex. B (Carlson Jan. 22, 2010, Dep.) 88-91; 99-100.) Specifically, Carlson was asked if he had personal knowledge whether DeYoe acted because she believed Carlson was facilitating a commercial development that she opposed; and whether Krickhahn acted because

he lives across from the Village Square development, opposed the development, and blamed Carlson for the development. Carlson was also asked whether he had personal knowledge that Leonard acted because she was upset with land use decisions made under Carlson's leadership, whether Mac Dougall acted because Carlson refused to sign a statement of agreement with Plan B Committee's findings, and whether Sadowski acted because he was upset at Carlson's refusal to cite the Fishbone's restaurant for a parking violation and because of Carlson's role in the investigation of an allegation of a bribe relating to a development. Carlson answered "no" to each of those questions. *Id*.

However, in opposition to the Defendants' motion for summary judgment, Carlson proffers his affidavit that he avers is based on personal knowledge. (Carlson Aff. ¶ 1.) In paragraph ten, Carlson avers that "[e]ach of the individual defendants had personal motives underlying their decisions to vote for my termination." (*Id*. at ¶ 10.) In paragraph 13, Carlson avers that "the actions of the City and individual [D]efendants in connection with the termination of my employment with the City – which included accusations of bribery, threats, and misconduct – were made known to the community at large, and, as a result, damaged my professional reputation and employability, hurt my good name, reputation, honor and integrity." (*Id*. at ¶ 13.)

*Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999), explains that it is a well-settled rule within this Circuit that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that

7

contradicts an earlier deposition and, in turn, defeat a defendant's motion for summary judgment. "Parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions." *Id.* (citing *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir. 1985)).

Although the Defendants state that the affidavit must be disregarded as a sham, they address specific paragraphs, not the entire affidavit. Paragraph ten of Carlson's affidavit, which purports to be based on personal knowledge, states that "[e]ach of the individual defendants had personal motives underlying their decisions to vote for my termination." The statement is a contradiction of Carlson's deposition testimony that he did not have personal knowledge of the motives of the individual Defendants. Carlson may not rely upon paragraph ten of his affidavit to create a factual dispute. *Id.* Paragraph ten will be disregarded.

However, consideration of paragraph 13 of Carlson's affidavit in comparison to his deposition testimony results in a different conclusion. Carlson's negative answers to the specific questions about whether he had personal knowledge regarding the motives of the individual Defendants, do not conflict with his averment that he had personal knowledge that the actions of the City and the individual Defendants in connection with the termination including accusations of bribery, threats, and misconduct were made known to the community. The Defendants have not established that paragraph 13 of Carlson's affidavit should be disregarded as an attempt to contradict his deposition testimony.

There is an additional reason to disregard paragraph ten of Carlson's affidavit. Carlson responded that he "does not dispute the facts contained in paragraph 25" of the Defendants' proposed findings of fact, which states he "has no personal knowledge as to the reasons why any of the individual defendants voted to terminate his employment."

Civil Local Rule 56 of this District sets forth the procedure for submitting motions for summary judgment. Civil Local Rule 56(b)(4) states that the "Court will deem uncontroverted facts admitted solely for the purpose of deciding summary judgment." The court of appeals has upheld the propriety of district courts' enforcement of local rules governing summary judgment motions. *See e.g., Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103-04 (7th Cir. 1990); *Cunningham*, 30 F.3d at 882-83; *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920-24 (7th Cir. 1994). Carlson may not rely upon paragraph ten of his affidavit to create a factual dispute, regarding the fact that he has admitted in response to the Defendants' summary judgment factual submissions.

### *Additional Evidentiary Issues*

The Defendants also object to Carlson's reliance on the statement in paragraph 13 of his affidavit regarding the impact of the City's actions on his employability. The Defendants maintain that the affidavit is not made on personal knowledge, and lacks foundation and specificity. Carlson has averred that his affidavit is based on personal knowledge. Resolution of the Defendants' contention that Carlson's affidavit is not made on

personal knowledge would involve a credibility determination which may not be made upon summary judgment. *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 690 (7th Cir. 2010).

However, Carlson's statement in paragraph 13 regarding the effect of the Defendants' actions on his employability is conclusory and simply repeats the allegations of the Complaint. That portion of his affidavit is devoid of any facts and is insufficient to raise a genuine dispute of material fact. *See Keri v. Bd of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (conclusory allegations unsupported by specific facts will not suffice to defeat summary judgment).

The Defendants also contend that Carlson's deposition testimony and affidavit do not establish that he has personal knowledge that individual Defendants met in secret to terminate his employment. At his deposition, Carlson testified that Mayor Phil Schuman ("Schuman") told Carlson that De Yoe told Schuman that the five individual Defendants met in secret and that they had enough votes to terminate Carlson's employment. (*See* Braithwaite Decl. ¶¶ 2-3, Ex. A (Carlson Dec. 28, 2009, Dep.) 14, 17, Ex. B 51-52.) In his affidavit, Carlson avers that on October 31, 2007, he "learned that five members of the Common Council . . . had been meeting in secret and had agreed to form a voting block to vote for termination of my employment." (Carlson Aff. ¶ 8.) Carlson further avers that specifically, De Yoe told Schuman prior to October 31, 2007, that the individual Defendants had together agreed to vote in favor of the termination of Carlson's employment, and De Yoe told Schuman

not to tell anyone. (*See id.* at ¶ 9.) The Defendants maintain that relaying what one person told you that another person said does not constitute personal knowledge.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Gunville v. Walker*, 583 F.3d 979, 986 (7th Cir. 2009) (citing Fed. R. Evid. 801(c)); *United States v. Harris*, 281 F.3d 667, 671 (7th Cir. 2002)). A court may only consider admissible evidence in assessing a motion for summary judgment. *Gunville*, 583 F.3d at 986.

Carlson's deposition testimony and the statements in his affidavit that Schuman told him that De Yoe told him (Schuman) that the five individual Defendants had been meeting in secret and had gathered the votes to terminate Carlson's employment were not made at trial or in a hearing and are offered to prove the truth of the statement; therefore, they are double hearsay, and are inadmissible. *See Swearnigen-El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010); *Gunville*, 583 F.3d at 986 (noting that Underwood's statement, as repeated by Danner, was not made at a trial or hearing, and the plaintiffs sought to use it to prove that voting records were accessed and used to make layoff decisions, and holding that, thus, Danner's version of Underwood's statements was inadmissible hearsay and did not overcome a motion for summary judgment.) Carlson may not use his deposition testimony or the statements in his affidavit regarding what Schuman told him that De Yoe said to him to defeat the Defendants' summary judgment motion. Having addressed these preliminary evidentiary issues, the Court sets forth the relevant facts.

11

On July 19, 1999, the City and Carlson entered into an employment agreement by which, among other things, the City employed Carlson as its City Administrator, commencing August 22, 1999. Carlson was appointed to the position as City Administrator by Ed McAleer ("McAleer"), who was the mayor of Delafield at that time. Carlson's appointment to the position of City Administrator was subject to the confirmation by the Delafield Common Council ("Common Council").

On June 18, 2002, the City and Carlson entered into a new employment agreement (the "Contract") relating to Carlson's employment as the City Administrator. The Contract was in force at the time of the termination of Carlson's employment by the City. Carlson; McAleer; Paul Craig, the City attorney; Al Zietlow; Linda Quartaro; and Linda Kuklinski were involved in drafting the Contract.[4]

On December 4, 2006, the Common Council passed a motion appointing Carlson as the City Treasurer and the Interim City Clerk. The motion was part of a reorganization of the Administrative Department of the City following the departure of the prior Clerk. At the time of the reorganization, the City Ordinances did not allow a single person to hold the combined office of Clerk and Treasurer. On October 1, 2007, the Common Council passed

---

[3]The relevant facts are based on the Defendants' proposed findings of fact and Carlson's statement of additional facts, to the extent that they are undisputed. Citations to quoted excerpts have been included even when the facts are undisputed.

[4]No other facts have been presented regarding the roles of these persons in drafting the Contract or specific portions of the Contract.

a motion enacting Ordinance 579, and repealing Ordinance 331. As a result of those Common Council actions, a single person could hold the combined office of Clerk and Treasurer.

When Carlson became Treasurer and Interim Clerk, some of the day-to-day duties of Treasurer and Clerk were performed by the City Accountant, Marie Williams, and the Deputy Clerk, Ellen O'Brien, for which both received recognition at Carlson's direction. Carlson's compensation was not increased as a result of his assumption of the role of Treasurer and Interim Clerk.

On November 5, 2007, the Common Council met in a closed session to consider Carlson's "employment, promotion, compensation, or performance evaluation." (Trebatoski Aff. ¶ 12, Ex. J (Minutes of Nov. 5, 2007, Common Council Mtg.) C-41).) Following the November 5, 2007, closed session regarding Carlson's performance evaluation, the City received an open records request from the press for Carlson's performance evaluations. Carlson provided the performance reviews to the press, upon direction of the City Attorney. Carlson did not like that the reviews were provided to the press, but does not dispute that the City was obligated to do so.

Carlson was asked by Kelly Smith ("Smith") of Lake Country Publications to comment in the newspaper regarding his performance review. Carlson provided Smith with an email reply to his question. Carlson received an inquiry from Amy Rinard ("Rinard") of The Journal/Sentinel and on November 15, 2007, provided her with a copy of several

documents, including the Contract, 2006 and 2007 performance evaluations, and a document

entitled "Year in Review 2007."

On November 19, 2007, following a discussion of the Common Council in a

closed session, five members of the Common Council: De Yoe; Krickhahn; Leonard; Mac

Dougall; and Sadowski, voted in an open session to terminate Carlson's employment without

cause. (Trebatoski Aff. ¶ 13, Ex. K (Minutes of Nov. 19, 2007, Common Council Mtg.) C-

75.)

> The resolution terminating Carlson's employment stated in part:
>
> As provided under . . . Carlson's employment contract with the
> City, the Common Council had the option to terminate . . .
> Carlson's employment for *no cause* upon payment of six month's
> severance. The Council decided to exercise this option so the
> City can move forward with new leadership.
>
> . . . Carlson was the City Administrator in Delafield for the last
> eight years. During this period the City has grown considerably
> and [Carlson] has contributed to the development of the City.
> Now, in the view of a majority of the [Common] Council, it is
> time to take a fresh look at City Government and City operations.
> The [Common] Council thanks . . . Carlson for his years of
> service to the City and wishes the best to him in the future.

(Compl. ¶ 20; Ans. ¶ 20.) (Emphasis added). Carlson's employment was terminated without

cause.

Following the City's termination of his employment, Carlson obtained

employment as the President and CEO of the National Sporting Goods Association on April

14

1, 2008. He is paid a salary of $180,000 per year, plus benefits including health insurance, pension, sick-time, holidays, and a company car.

Carlson has never made, or filed a formal complaint with the Waukesha County District Attorney regarding his belief that the individual defendants violated the Wisconsin Open Meetings Law with respect to the termination of his employment. Carlson has no personal knowledge that the Individual Defendants met in secret to terminate his employment.

While Carlson was employed as the Delafield City Administrator, he sought employment with other municipalities, including: Glenview, Illinois; Menomonee Falls, Wisconsin; Naples, Florida; Sarasota, Florida; and Oak Lawn, Illinois. Carlson was not asked to resign from the Lion's Club, the YMCA Board, or the hospital board. Carlson is aware of no documents that state that he must resign from those organizations. Carlson contends that he is entitled to his full salary and benefits for 2008, 2009, and the first six months of 2010, based on his interpretation of the Contract as providing for an automatic two-year renewal plus severance.

Miskelley has no personal knowledge that the five individual Defendants met in secret to discuss the termination of Carlson's employment. No one has told him that they did and he knows of no witnesses to such a meeting. Miskelley called Mac Dougall and DeYoe to try to influence them to not vote to terminate Carlson's employment. Miskelley understood the Contract gave the City the right to terminate Carlson's employment, without

cause, without a hearing, if the City paid him the severance package specified in Section 8(B)(4).

The City police chief, Scott Taubel ("Taubel"), has no personal knowledge as to whether the individual Defendants met in secret to discuss the termination of Carlson's employment prior to voting to terminate it or as to why any of the five individual Defendants voted to terminate Carlson's employment.

De Yoe understood the Contract to allow the City to terminate Carlson's employment without cause and referenced section 8(B)(4) as the basis for that understanding. De Yoe noted that the Contract did not contain a provision stating that the City could not terminate Carlson's employment without cause.

When Krickhahn voted to terminate Carlson's employment without cause it was his understanding that the Contract allowed for termination of Carlson's employment without cause. Leonard understood that the vote to terminate Carlson's employment was without cause and Leonard believed that it related to section 8(B)(4) of the Contract. Leonard did not read section 8(B) as a sequential process, where paragraph (4) was in reference to what happens in steps (1) through (3).

Mac Dougall's vote to terminate Carlson's employment was without cause. Mac Dougall did not understand the Contract that well and he had concerns because Carlson had drafted the Contract. In the week prior to the vote in open session to terminate Carlson's employment, Mac Dougall felt that Miskelley, Schuman and various "mover[s] and shaker[s]"

in Delafield, whom Mac Dougall referred to as "the good 'ole boys, the downtown boys," were pressuring him to support Carlson. (Braithwaite Decl. ¶ 9, Ex. H (Mac Dougall Dep.) 105.) According to Mac Dougall, Carlson tried to influence his vote regarding the termination. However, there was no similar effort to get him to terminate Carlson's employment.

Legal counsel was present during the closed session discussion of the termination of Carlson's employment and the alderpersons solicited and obtained legal advice from counsel regarding the termination of Carlson's employment. Leonard based her conclusion that the Contract allowed for the termination of Carlson's employment without cause on a conversation with the City's legal counsel.

## *ANALYSIS*

The Defendants seek summary judgment dismissing each of Carlson's claims against them.[5]  The Court begins with consideration of the issues raised with respect to Carlson's § 1983 claims against the Defendants:  his Fourteenth Amendment due process claim for deprivation of a property interest (first claim for relief) and his Fourteenth Amendment due process claim for deprivation of a liberty interest  (second claim for relief). The individual Defendants assert that they have immunity from those claims.

### *Legislative Immunity*

Relying on *Bogan v. Scott-Harris,* 523 U.S. 44 (1998), the individual Defendants assert that they are entitled to legislative immunity for their votes in favor of terminating

---

[5]The Defendants' motion includes a request that the Court dismiss an open meeting claim.  However, Carlson states that he has never asserted such a claim.  Therefore, that contention is not addressed.

Carlson's employment. *Bogan*, extended absolute immunities for local legislators for § 1983 liability for legislative acts. Absolute legislative immunity extends to all actions taken in the sphere of legitimate legislative activity and depends on the nature of the acts. *Id*. at 55. In *Bogan,* the Supreme Court held that acts of voting for an ordinance, that eliminated the city department of which the plaintiff was the sole employee, was a legislative act in substance. *Id*. The court held that the ordinance reflected a discretionary policy-making decision implicating the budgetary priorities of the city and the services it provided its inhabitants, as well as involving the termination of a position, which unlike the hiring or firing of a particular employee, might have implications that reached beyond the occupant of the office. *Id*. at 55-56.

The circumstances of this case are distinguishable from those of *Bogan*. The November 19, 2007, vote did not to eliminate a City position or department. The individual Defendants voted to terminate Carlson's employment. Unlike the ordinance at issue in *Bogan*, the individual Defendants engaged in an administrative act by voting to remove Carlson from his position with the City. *See id.*; *See also Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 696 (7th Cir. 2004); *Campana v. City of Greenfield*, 38 F. Supp. 2d 1043, 1049-50 (E.D. Wis. 1999). The individual Defendants have not established that they are entitled to legislative immunity.

## *Qualified Immunity*

The individual Defendants also maintain that they are entitled to qualified immunity because they relied upon the advice of counsel. Qualified immunity, protects government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A two-part test to determine whether the doctrine attaches: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Supreme Court has made clear that the doctrine of qualified immunity provides "ample room for mistaken judgments" and protects all those but the "plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). While the parts of the qualified immunity test may be considered in either order, *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009), the Court will first consider whether the facts taken in the light most favorable to Carlson establish that his constitutional rights were violated. *Akande v. Grounds*, 555 F.3d 586, 589 n.3 (7th Cir. 2009).

## *Property Interest Claim*

Carlson's first claim for relief is that he was deprived of a property interest in his position as City Administrator without due process. A property interest in public

employment exists if the plaintiff has a legitimate entitlement to his job, which usually stems from the rules, laws, or policies of the employing entity.  The property interest in this case rests upon the Wisconsin Statutes, the Delafield Ordinance, case law, and the Contract entered into between the City and Carlson.  The Court looks to all of these to determine the nature of Carlson's property interest, and, what process he deserved  to protect that interest.  *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).[6]  In *Cole v. Milwaukee Area Technical College District*, No. 10-1332, ___ F.3d ___, 2011 WL 650715, at * 3 (7th Cir.  Feb. 24, 2011), the court recently stated: "Under Wisconsin law, 'a dichotomy exists between employment 'at will' and employment which can be terminated only 'for cause.'  *Beischel v. Stone Bank School District*, 362 F.3d 430, 436 (7th Cir. 2004)."  " Employment which can be terminated only 'for cause' receives due process protections."  *Id.* (citing *Beischel*, 362 F.3d at 436).  Conversely, if a party's employment contract does not provide for termination *only* "for cause," the party's employment falls into a "gray area" between "the two poles set up in Wisconsin law,'" *id.* (quoting *Beischel*, 362 F.3d at 436 (emphasis added), and therefore is not entitled to due process protection.  "Employees in this 'gray area' do not normally have a protectable property interest in continued employment."  *Cole*, 2011 WL 650715 at *3 (citing *Beischel*, 362 F.3d at 436, and *Fittshur*, 31 F.3d at 1405-07).

Carlson argues that the state law, the ordinance in question and the Contract he negotiated with the City required a removal for cause hearing before his employment could

---

[6] The events giving rise to this suit occurred in Wisconsin, so its law governs.  *Fittshur v. Vill. of Menomonee Falls*, 31 F.3d 1402, 1405-06 (7th Cir. 1994)

be terminated. As the facts indicate, Carlson was appointed as City Administrator by the mayor and his appointment was approved by the Common Council, as required, by § 1.03 of the City Ordinances.[7] *See* http://library6.municode.com (last visited Mar. 8, 2011). Section 1.05 of the Delafield Ordinances provides that "[a]ppointed officials may be removed as provided in §§ 17.12(1)(c) and 17.16, Wis. Stats." *Id.* Section 17.12(1)(c) of the Wisconsin Statutes states that city officers may be removed as follows: "[a]ppointed officers, by whomsoever appointed, by the common council, for cause except officers appointed by the council who may be removed by that body at pleasure." Section 17.16(3) states "Removals from office for cause shall be made as provided in this section."

Further, Section 17.001 of the Wisconsin Statutes provides that "cause" in Chapter 17 of the statutes, unless otherwise, qualified means "inefficiency, neglect of duty, official misconduct, or malfeasance in office." The procedures for removal "for cause" are set forth in Wis. Stat. § 17.16, and include a requirement of written notice of the charges, a speedy hearing, and a full opportunity to present a defense. Indeed, Section 8(B)(1)(2) & (3) of the parties' Contract incorporates those requirements. Carlson argues that the statute and the Contract that incorporates it, supported by the reasoning in *DeLuca v. Common Council of City of Franklin*, 242 N.W.2d 689 (Wis. 1976), required a "for cause" hearing before his employment could be terminated.

---

[7] Although Carlson also served as Clerk and Treasurer, his action only relates to his removal as City Administrator. Moreover, those positions are also appointed by the mayor, subject to confirmation by the Common Counsel. *See* Delafield Ordinance § 1.03(1).

*DeLuca* holds that under the discussed statutory provisions DeLuca, a City Clerk, was entitled to due process protections that required removal "for cause." "The property interest of DeLuca in his employment was one conferred by the law of the state and, as such, is protected by the due-process provisions of both the state and federal constitutions." *Id.* at 693.

In *DeLuca*, the City of Franklin did indeed bring a removal action against DeLuca "for cause," but as explained by the Wisconsin Supreme Court, "[t]he fundamental issue presented in DeLuca's application for certiorari and the issue before us on appeal is whether the investigatory and adjudicatory functions were so intermingled in these removal proceedings that DeLuca was denied due process." *Id.* at 692.

*DeLuca* is of limited value here because the issue before this Court is not whether Carlson was afforded his due process rights in connection with a "for cause" hearing. Carlson did not receive a "for cause" hearing. The issue is whether the property interest that Carlson had was limited or conditioned by the Contract that he negotiated with the City which altered the amount of process he was due. In other words, given the Statute, the case law, the Ordinance, and the Contract, was Carlson removable *only* for cause or were there other bases for removal that placed him in the "gray area" discussed in *Beischel*?

*DeLuca* does state that a person in DeLuca's circumstances can only be removed "for cause." "This statute provides that an officer of a municipality *having the status of DeLuca* can only be removed for cause." *Id.* at 677. (Emphasis added.) But, Carlson is not

in the same status as *DeLuca*, and the Seventh Circuit in its commentary on *DeLuca* has found the removal of a City Clerk may be for reasons other than cause. *See Brockert v. Skornika*, 711 F.2d 1376, 1385-86 (7th Cir. 1983).

> [T]he [Wisconsin Supreme Court] found that the Wisconsin statute governing dismissal of city clerks allowed removal only for cause. Although the court did not explicitly set forth the language giving rise to that property interest, dismissal of city officers is governed by Wis. Stat. § 17.12. The relevant provisions of that statute show that city officers may be removed for cause; *the statute does not state that removal may be only for cause*. The court seems to have found that a list of causes for dismissal was exclusive in the absence of any exclusive language.

*Id.* (Emphasis added).

*Brockert* concluded that relative to the state of the law in Wisconsin there is "no definitive answer" and that the level of protection afforded any property interest "*would require a factual inquiry. Such an inquiry would focus on past practices under the civil service system and the intent of the parties*." *Id*. at 1386. (Emphasis added.) Unlike *DeLuca*, where the nature of his property interest was defined by only the statute which required a "for cause" hearing, Carlson's property interest is affected by "*the intent of the parties*" as expressed in the Contract. *See id.*

The Contract allows the City to discharge Carlson for cause or without cause. Indeed, Carlson does not dispute the fact that the City may discharge him without cause.

> . . . Carlson does not interpret the Agreement as *never* permitting the City to terminate without cause. According to Section 8 of the Agreement, if the City initiates a "for cause" termination, and, as a result of the due process procedure, it is determined that the

> City does not have cause for termination, the termination is nevertheless effective provided that the City provides severance pay.

(Pl.'s Br. Opp'n Defs' Mot. Summ. J. 14.)  This view of the Contract does not support a finding that Carlson can only be removed "for cause."

Carlson further argues that the City had to proceed with a "for cause" hearing because the City had a basis to remove him "for cause."

> Because the reasons held by all of the individual defendants for terminating Carlson fall under the definition of "cause" under the Agreement, the Agreement required the City to initiate its termination of Carlson as one "for cause."  It is simply not true that, in the words of Paragraph 8.B.4., "the City does not have cause for termination." The City *had* cause to initiate Carlson's termination . . . .

*Id.* at 13.  This position merely reinforces the fact that the City had procedural choices under the Contract for removing Carlson.  Arguing that the City should not have removed Carlson "without cause" because the City had a basis for "for cause" removal does not establish that "for cause " removal was the exclusive basis for removal.

The language of the Contract also supports the conclusion that the City had choices.  The Contract recognized that the City could discharge Carlson "for cause" which would result in the payment to Carlson of a *lesser severance package*.  It also allowed the City to discharge Carlson without cause which would result in the payment of a *more substantial severance package*.

Carlson would receive, if the discharge was "for cause," a lump sum cash payment for all accrued vacation, sick, and personal days and all accrued payments through deferred compensation or pension programs. In exchange for the City's discharge of Carlson without cause, Carlson would receive in addition to the above, "severance pay in a lump sum equal to six (6) months pay and benefits." This differential in severance packages highlights the intent of the parties to give to the City alternative means of discharge.

What Carlson asks this Court to do is find that the property interest he has under the Contract requires the full due process protection of a "for cause" hearing that would, if a "for cause" basis for his discharge was found, result in lesser benefits under the Contract; but, if not found, would result in the right of the City to do what it has already done; i.e., discharge him without cause, with resulting greater benefits. In short, Carlson is asking the Court to apply the "protections" of due process that would serve to lessen or weaken the benefits attached to the property interest he has already received under the City's execution of the Contract terms. The invocation of due process is to protect property interests, not to diminish those property interests.

The Court concludes that Carlson did not have the type of property interest in his continued employment during the term of his Contract that required termination *only* "for cause." Carlson was not denied his procedural due process rights upon being discharged without cause.

Based on the foregoing, the defendants have established that they are entitled to summary judgment dismissing Carlson's Fourteenth Amendment claim for deprivation of a property interest claim. Because of this finding, the individual Defendants have established that they are entitled to qualified immunity on this basis.

The Court need not address the second prong of the qualified immunity test. However, if the Court's analysis is wrong and Carlson's constitutional rights were violated, the individual defendants are entitled to the defense of qualified immunity under the second prong of the test; i.e., the constitutional rights that were violated were not clearly established at the time so that a reasonable person in the position of the individual defendants should have known of them.

Indeed, Carlson concedes this to be the case when he argues that the Contract that he and the defendants entered into was at least ambiguous.

> Even if the Court chooses not to adopt Carlson's interpretation of the Agreement as being unambiguous, the Court should at the very least conclude that the Agreement is ambiguous and therefore not appropriate for resolution on summary judgment.

(Pl.'s Br. Opp'n Defs.' Summ. J. Mot. 15.) Because the claimed Constitutional violations are wedded to and are part and parcel of the Contract, the concession as to the Contract's ambiguity casts the claimed constitutional violation in the same light.

### *Liberty Interest Claim*

The Defendants contend that Carlson's Fourteenth Amendment claim for deprivation of his liberty interest must be dismissed because he has not alleged that he suffered

a tangible loss of other employment opportunities, and he has not alleged and cannot show that any defendant made a false assertion of fact. In addition, they maintain that because the City was legally required to release his performance evaluations in response to open records requests from the press, the release of that information cannot provide the basis for his due process claim, citing *Ulichny v. Merton Community School District*, 93 F. Supp. 2d 1011 (E.D. Wis. 2000). The Defendants also contend that, although Carlson alleges that he was required to resign from a number of boards, he was not asked to resign from any of the specified boards and Carlson is not aware of any documents requiring that he resign from those boards.

       *Board of Regents of State Colleges v. Roth*, 408 U.S. at 573, provides a basis for claims when the state infringes on an employee's liberty interests by discharging the employee while making false charges against him, so damaging the employee that he is precluded as a practical matter from finding other government employment. *Strasburger v. Bd. of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998) (citing *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997); *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1349 (7th Cir. 1995); *Wallace v. Tilley*, 41 F.3d 296, 299 (7th Cir. 1994); *McMath v. City of Gary*, 976 F.2d 1026, 1031-32 (7th Cir. 1992); *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991); *Ratliff v. City of Milwaukee*, 795 F.2d 612, 625 (7th Cir. 1986)). To prevail on a liberty cause of action, a discharged state employee must show that "(1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed, and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Strasburger*, 143 F.3d at 356 (citing *Johnson*, 943 F.2d at 16).

The public disclosure element requires that the defendant actually disseminate the stigmatizing conduct in a way that would reach potential future employers or the community at large. *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010), *pet. for certiorari filed,* 79 U.S.L.W. 3435 (Jan. 5, 2011)(No. 10-892). *See also*, *Khan v. Bland*, 630 F.3d 519, 534 (7th Cir. 2010).

In this case, the only evidence that Carlson has presented that any of the Defendants made false statements about him are contained in his affidavit. He avers that the actions of the City – which included (among other things) accusations of bribery, threats, and misconduct, and misconduct – were made known to the public. As previously stated, these conclusory statements, backed by no evidence, are insufficient to establish that there is a genuine dispute of material fact for trial regarding the public disclosure element. *See Petts v. Rockledge Furniture LLC,* 534 F.3d 715, 722-23 (7th Cir. 2008); *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004). Despite construing the facts in the light most favorable to Carlson, he has not presented any evidence upon which a reasonable jury could conclude that any of the defendants actually disseminated the stigmatizing conduct in a way that would reach potential future employers or the community at large. *See Palka*, 623 F.3d at 454.

In seeking summary judgment on this claim, the Defendants rely in part upon the deposition testimony of Taubel. They state that Taubel noted that in his opinion most of the people in the City did not pay attention to rumors regarding the termination of Carlson's employment. Carlson disputes the proposed finding asserting that most residents did not pay attention to whether Carlson had been discharged for some type of misconduct. (Defs.' Reply

28

to Pl.'s Resp. Defs.' PFOF, Defs.' PFOF ¶ 41.) The cited deposition testimony is somewhat convoluted, at least in part due to the manner in which Taubel was questioned by counsel. (*See* Braithwaite Decl. ¶ 5, Ex. D (Taubel Dep.) 25-28).) However, even accepting Carlson's interpretation of the testimony, he has not raised a material factual dispute because Carlson has not presented any evidence that any of the Defendants actually publicly disseminated any stigmatizing comments. *See Palka*, 623 F.3d at 454. Nor, has he presented any evidence that he was precluded from obtaining employment in his chosen field. *See id.* at 454-55. Carlson's liberty interest claim is dismissed because, despite construing the evidence in the light most favorable to him, he has not presented sufficient evidence upon which a reasonable jury could find in his favor on that claim.

### *Supplemental State Claims: Whether to Retain Jurisdiction*

At this juncture, Carlson's federal claims have been dismissed on summary judgment. However, there remain pending his two supplemental state law claims which have been fully briefed by the parties.

The parties' briefs are silent on the issue of how the Court should proceed under these circumstances. The supplemental jurisdiction statute provides that a district court "may" decline to exercise jurisdiction over supplemental state-law claims for several enumerated reasons, including where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

The Court is aware that when all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction pursuant to § 1367(c)(3).[8] *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008). Although the Court may relinquish its supplemental jurisdiction if one of the conditions of § 1367(c) is satisfied, it is not required to do so. *Id.* Supplemental jurisdiction is a doctrine of discretion, and its "justification lies in considerations of judicial economy, convenience and fairness to litigants." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

Additionally, even where the district court has dismissed all of the federal claims over which it has original jurisdiction, its discretion to remand supplemental state-law claims is not absolute. *See In re Repository Technologies*, 601 F.3d 710, 725 (7th Cir. 2010). "[I]f a district court's pre-trial disposition of a federal claim would have 'preclusive effect' on the supplemental state-law claims, *Miller Aviation v. Milwaukee County Bd. of Supervisors*, 273 F.3d 722, 731 (7th Cir. 2001), or if the supplemental and federal claims 'are so entangled' that

---

[8] According to § 1367(c), a district court may decline to exercise supplemental jurisdiction over a state law claim if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Court notes that Wis. Stat. § 893.43, provides: "An action upon any contract, obligation or liability, express or implied . . . shall be commenced within 6 years after the cause of action accrues or be barred." Thus, Carlson's state law breach of contract action would not be time-barred.

'the rejection of the latter probably entails rejection of the former,' *Coe v. County of Cook*, 162 F.3d 491, 496 (7th Cir. 1998), the Court should retain supplemental jurisdiction.    In re *Repository Technologies*, 601 F.3d at 725.  That is because "when a state-law claim is clearly without merit, it invades no state interest  –  on the contrary, it spares overburdened state courts additional work that they do not want or need –  for the federal court to dismiss the claim on the merits rather than invite a further, and futile, round of litigation in the state courts."  *Id*.

In this instance, this hard-fought action, which included a fierce discovery dispute, has been pending for more than  two years.  Carlson's § 134.01 claim does not meet federal pleading standards and, more significantly, is not supported by sufficient evidence upon which a reasonable jury could find in his favor.  It would be senseless  to send that meritless claim to the overworked state court system.

With respect to Carlson's breach of contract claim, the Court has carefully considered the Contract in conjunction with its analysis of Carlson's federal property interest claim.  As will be further discussed, part of the breach of contract claim is readily subject to dismissal for lack of any supporting evidence.  The remaining portion of the breach of contract claim will not be resolved upon summary judgment.  However, its resolution will be controlled by the Court's prior construction of the Contract in conjunction with Carlson's federal property interest claim and will be limited to a damages determination.  It would be an unnecessary burden on state court to remand the matter for the sole purpose of determining

contract damages.  Therefore, the Court will retain jurisdiction over the remaining state law claims, and address the issues relative to those claims.

### *Section 134.01 Conspiracy to Injure Reputation and Profession Claim*

The Defendants maintain that Carlson's supplemental state law claim for conspiracy to injure his reputation and profession under § 134.01 of the Wisconsin Statutes is insufficient on its face because such a claim requires that the defendant inflict a harm for the sake of harm as an end itself, not merely to further some other end legitimately desired. The Defendants also assert that the "intercorporate conspiracy doctrine" bars Carlson's § 134.01 claim, and he lacks any evidence to support the claim of conspiracy.  In addition, the Defendants contend that the claim is barred by the exclusive remedy provision of the Wisconsin Worker's Compensation Act ("WCA").

Carlson contends that a genuine issue of material fact exists regarding his claim under § 134.01, and he has plead malice in the Complaint making his claim facially sufficient. Carlson further asserts that he has presented evidence of a conspiracy, the Wisconsin courts have not yet ruled on whether intercorporate conspiracy doctrine should be extended to include individuals in a governmental entity, and his claim is not barred by the exclusivity provision of the WCA.

Although presented in the context of their motion for summary judgment, the individual  Defendants assert that Carlson has failed to state a claim under § 134.01 because he has failed to allege that they acted with malice.  To avoid dismissal for failure to state a

claim, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). In determining whether the complaint states a cause of action, all of the factual allegations contained in the complaint are accepted as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). However, a complaint that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not do. *Ashcroft v. Iqbal*, __ U.S. __ , 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Carlson alleges that the individual Defendants "mutually agreed and acted in concert for the purpose of willfully or maliciously injuring Carlson in his reputation and business." (Compl. ¶ 39). Section 134.01 allows the imposition of criminal penalties on those who conspire to "willfully or maliciously injur[e] another in his or her reputation, trade, business or profession." Wisconsin courts have interpreted this statute to provide a civil cause of action for those who are harmed by violation of this statute. *Radue v. Dill*, 246 N.W.2d 507, 511 (Wis. 1976).

To prove a claim for conspiracy under Wis. Stat. § 134.01, a plaintiff must prove that (1) the defendants acted together, (2) with a common purpose to injure the plaintiff's reputation and business, (3) with malice, and (4) the acts financially injured the plaintiff. WIS JI Civil-2820. "For a conspiracy to exist, there must be, at a minimum, facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." *Bartley v. Thompson*, 542 N.W.2d 227, 234-35 (Wis. Ct. App. 1995) (internal quotations omitted).

In the context of Carlson's § 134.01 claim, this means the allegations must make it more than speculative that at least two of the individual Defendants did "combine, associate, agree, mutually undertake or concert together" "for the purpose of willfully or maliciously injuring" the reputation, trade, business or profession of Carlson. *See* Wis. Stat. § 134.01. "[T]o form a conspiracy there must be an 'agreement to violate or disregard the law,' and the persons involved must 'knowingly [be] members of the conspiracy.'" *Bruner v. Heritage Cos.*, 593 N.W.2d 814, 818 (Wis. Ct. App. 1999) (citing WIS JI Civil-2800). The "[m]ere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish the existence of a conspiracy." *Bartley*, 542 N.W.2d at 236 (quoting WIS JI Civil- 2800).

In either case, "[t]here can be no conspiracy if malice is not found in respect to both conspirators." *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 469 N.W.2d 629, 634 (Wis.

1991).  The malice required to prove a claim under § 134.01 is more than an intent to do harm.

*Brew City Redevelopment Group, LLC v. Ferchill Group*, 724 N.W.2d 879, 886 n.7 (Wis.

2006).  What is required is an intent to do "wrongful" harm.  *Id*.

> Such harm does not include incidental harms that derive from a
> person's seeking competitive advantage.  It requires inflicting a
> harm 'for the sake of harm as an end in itself, and not merely as
> a means to some further end legitimately desired [such as hurting
> someone else's business by competition].'

*Id*. (quoting *Maleki*, 469 N.W.2d at 635).  "For conduct to be malicious under conspiracy law

it must be conduct intended to cause harm for harm's sake."  *Maleki*, 469 N.W.2d at 634.

Carlson's bare allegation that the individual Defendants acted "maliciously" is

formulaic and does not constitute a sufficient pleading of malice under federal pleading rules.

Although the individual Defendants are alleged to have acted in a manner to "harm" Carlson's

reputation and to injure him in his profession, the Complaint does not allege conduct intended

to do harm for harm's sake.  (*See* Compl. ¶ 40).  The Complaint alleges that the individual

Defendants acted to retaliate against Carlson for his response to the recommendations of the

City's "Plan B Committee," and, upon information and belief, one or more specific reasons

that each individual Defendant acted in response to actions of Carlson in his capacity as City

administrator.  However, Carlson has not sufficiently alleged facts indicating that at least two

of the individual Defendants acted to cause harm to Carlson for harm's sake.  Therefore,

Carlson's cause of action under § 134.01 fails to state a claim for relief.

Even if Carlson's § 134.01 claim was adequately pled, he has not presented any admissible evidence that the individual Defendants came to an agreement, explicitly or otherwise. Carlson's testimony about what Schuman told him that De Yoe related to him is hearsay upon hearsay and is inadmissible. The only other testimony that Carlson relies upon is that of Miskelley. However, it is undisputed that Miskelley has no personal knowledge that the five individual defendants met in secret to discuss the termination of Carlson's employment. None of the five individual defendants has told them that they did and Miskelley knows of no witnesses to the supposed secret meeting of the five individual defendants. Carlson has not presented any evidence of a conspiracy as would be necessary to overcome summary judgment dismissing his § 134.01 claim.

Since Carlson has failed to adequately plead his § 134.01 claim and, also has not presented any evidence upon which a reasonable jury could conclude that the defendants conspired, his § 134.01 claim (third claim for relief) is dismissed. In light of the foregoing determinations, the Court need not address the additional grounds that the Defendants raise for dismissal of the claim.

### *Breach of Contract Claim*

The Defendants also seek summary judgment dismissing Carlson's supplemental state law breach of contract claim which, to reiterate, is based on his contention that the City did not have the right to terminate his employment without cause and that the City failed to pay him for $12,019.20 in accumulated leave time that he earned in 2007.

36

Under the Court's construction of the relevant Contract provision, the Contract did permit the Defendants to terminate Carlson's employment without cause and requires the payment of six-months severance pay and accrued benefits. Therefore, Carlson may recover those amounts that are due and owning, to the extent they are undisputed.

The Defendants also assert that they are entitled to summary judgment dismissing Carlson's breach of contract claim for an additional $12,019.20 for accumulated leave time because he has not presented any evidence to support his claim. Carlson has not responded to the Defendants' contention regarding his claim for compensation for accumulated leave time nor has he presented any evidence to support that claim. Since Carlson has not presented any evidence to support his breach of contract claim with respect to compensation for accumulated leave, summary judgment dismissing that portion of Carlson's breach of contract claim is granted.

The sole remaining claim is that portion of Carlson's breach of contract claim relating to his six months of severance pay and accrued benefits (other than any accumulated leave). The Court will conduct a conference call with the parties to discuss any further proceedings that may be required.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The Defendants' motion for summary judgment of dismissal is **GRANTED** as to Carlson's first claim for relief for deprivation of his right to procedural due process; his second claim for relief under 42 U.S.C. § 1983 for deprivation of a liberty interest; his third claim for relief under § 134.01 of the Wisconsin Statutes; and that portion of his fourth claim for relief for breach of contract seeking payment of $12,019.20 for accumulated leave time from 2007.

This matter is set for a telephone status conference on **March 24, 2011, at 9:30 A.M.,** to schedule further proceedings in this matter on the remaining portion of Carlson's breach of contract claim for termination of his Contract without cause (part of the fourth claim for relief).  The Court will initiate the call.

Dated at Milwaukee, Wisconsin this 11th day of March, 2011.

**BY THE COURT**

*s/ Rudolph T. Randa*
**Hon. Rudolph T. Randa**
**U.S. District Judge**